UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BUDICAK, INC., on behalf of itself and all other similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 18 C 4966 |
| v. | ) ) ) | Judge Edmond E. Chang |
| LANSING TRADE GROUP, LLC and JOHN DOES NOS. 1-6, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this proposed class action, Budicak, Inc. sued Lansing Trade Group, LLC and unknown individuals, alleging that Lansing unlawfully manipulated wheat futures and options contracts traded on the Chicago Board of Trade (CBOT) in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, the Sherman Antitrust Act, 15 U.S.C. § 1, and common law unjust enrichment and restitution. R. 1, Class Action Compl.[1] Lansing now moves to transfer the case to the District of Kansas, where the company is based. R. 26, Defs.' Mot. Transfer. Budicak, which is based in Oak Brook, Illinois, prefers to litigate the matter here in Chicago. *See* R. 32, Pl.'s Resp. Br. For the reasons explained below, Lansing's motion is granted.

---

[1] This Court has subject matter jurisdiction over the federal claims in this case under 28 U.S.C. § 1331. Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

**I. Background**

Lansing is a commodity merchandising company that buys, sells, handles, and stores physical commodities such as wheat in the cash market. Class Action Compl. ¶ 50, In early March 2015, Lansing allegedly caught wind of an insider tip: another market participant was planning to register and tender delivery of a large number of wheat shipping certificates.[2] *Id.* 55. This tip meant that there was a lack of demand for wheat and that the price of futures contracts would drop. *Id.* ¶ 55. Budicak alleges that Lansing used this insider information to come up with a plan to manipulate the prices of wheat futures and contracts. *Id.* ¶ 56. At least three Lansing traders, identified in the complaint as Lansing Traders 1, 2, and 3, were in on the plan and communicated internally among themselves and externally with John Doe Defendants to effectuate their scheme. *Id.* ¶ 11.

On March 3, 2015, the insider tip came to fruition. A market participant registered and tendered 250 wheat certificates, and the price of wheat contracts and associated spreads[3] began declining. Class Action Compl. ¶¶ 58-59. So Lansing's traders began increasing its wheat spread and wheat call option positions at the new lower prices. *Id.* ¶ 59. And then, within the next few days, Lansing's traders bought all 250 wheat certificates with the plan to cancel them for load-out soon after. *Id.* ¶ 60. In other words. Lansing planned to order the physical grain to be "loaded-out" for

---

[2]Shipping certificates are the delivery instrument on wheat futures contracts. Class Action Compl. ¶ 49. The owner of a shipping certificate can buy, sell, hold, or cancel the certificate. *Id.*

[3]A spread refers to the price differential between any two items. For example, spreads often refer to price differences between futures contracts on the same commodity but with different expirations. Class Action Compl. ¶¶ 47-48.

transport. *Id*. ¶ 49. This would signal to other market participants that there was immediate demand for the market because someone supposedly wanted the wheat taken out of storage. *Id*. But the demand, according to Budicak, was in fact artificial. *Id*. ¶ 61. Nevertheless, even the *perception* of an increased demand meant that the value of Lansing's own wheat spread and wheat call option positions would go up. *Id*. ¶¶ 61-62. So to make sure that the market knew about the demand, Lansing Trader 1 allegedly asked the writer of a daily cash-wheat newsletter, as well as multiple market participants, to spread the word on Lansing's intent to cancel and load-out the wheat certificates. *Id*. ¶¶ 65-67. And they did. *Id*. ¶ 65. Meanwhile, Lansing's long wheat spread and wheat call option positions gradually increased in value according to plan. *Id*. ¶ 61. By March 10, 2015, Lansing had cancelled all of its wheat certificates. *Id*. ¶ 68.

According to the complaint, Lansing's scheme caused harm to Budicak and others who transacted in CBOT wheat futures and options contracts at the artificial prices. Class Action Compl. ¶ 14. To obtain a remedy for the alleged scheme, Budicak brings this proposed class action, alleging that Lansing violated the CEA and Sherman Act.

## II. Legal Standard

"For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). To justify a transfer of venue, several factors must be satisfied: (1) venue must be proper in the transferor district, (2) venue

3

would be proper in the transferee district, (3) the transferee district would be more convenient for the parties and witnesses, and (4) transfer would serve the interests of justice. *See Jaramillo v. DineEquity, Inc.*, 664 F.Supp.2d 908, 913 (N.D. Ill. 2009); *see also Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 n.3 (7th Cir. 1986). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (cleaned up)[4]; *see also Coffey*, 796 F.2d at 219 ("The weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude, and, therefore, is committed to the sound discretion of the trial judge."). The moving party has the burden of establishing "that the transferee forum is clearly more convenient." *Coffey*, 796 F.2d at 219–20. Moreover, because § 1404(a) does not specify the weight to be accorded each factor, the decision is left to the discretion of the court. *See Coffey*, 796 F.2d at 219; *see generally* 15 C. *1128 Wright & A. Miller, Federal Practice § 3844–47 (1986).

### III. Analysis

To begin, for the purposes of this motion, neither party contests that venue is proper in this District and also would be proper in the proposed transferee district, the District of Kansas. The Court therefore turns to whether transfer would provide

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

4

greater convenience and serve the interests of justice. As detailed below, both factors weigh in favor of transfer.

## A. Convenience

In assessing convenience, "courts generally consider the availability of and access to witnesses, ... each party's access to and distance from resources in each forum[,] ... the location of material events[,] and the relative ease of access to sources of proof." *Research Automation, Inc. v. Schrader–Bridgeport Int'l., Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (citations omitted). On the whole, the elements favor litigating this case in Kansas.

First, most of the relevant witnesses in this case are located in Kansas. Lansing is headquartered in Overland Park, Kansas, where most of the key witnesses and employees likely to have direct knowledge of the alleged unlawful scheme live and work. *See* R. 26-1, Declaration of Lansing Vice President Mike Lemke ¶¶ 5-8. In particular, Lansing Trader 3 and the Lansing Executive identified in Budicak's complaint as being directly involved with the alleged scheme continue to work in Lansing's Overland Park office and live in the Kansas City area. *Id.* ¶ 5. In addition to the individuals identified in Budicak's complaint, many current and former employees who are likely to have knowledge about Budicak's claims—including Lansing's Vice President of Grains, Chief Executive Officer, senior location managers, and trader's assistants and accounting staff—likewise work and live in the Kansas City area. *Id.* ¶ 7. These employees are likely to have knowledge of the development or approval of the alleged strategy, relevant trading in wheat futures and options, and the cash market sales of the futures Lansing loaded out. *Id.* And if this case

5

continues to be litigated and goes to trial in Chicago, all of these witnesses would have to incur travel expenses, which are a "central measure of [in]convenience." *Craik v. Boeing Co.*, 37 F.Supp.3d 954, 962 (N.D. Ill. 2013).

Against those witnesses, Budicak points out that two non-party witnesses do not live in Kansas: the market-newsletter writer and the market participant. Pl.'s Resp. Br. at 9. But only the market participant is located in Chicago; the newsletter writer is located in Oregon City, Oregon. *Id.*; Declaration of Lansing Vice President Mike Lemke ¶ 6. So either way, regardless of where this case is litigated, the market-newsletter writer would be inconvenienced. And the inconvenience of the market participant alone does not outweigh the inconvenience that the various witnesses discussed above would incur if they were to have to travel here. Thus, Lansing has met its burden of identifying potential non-party witnesses and explaining the subject matter of their testimony, supporting its contention that there is greater convenience in litigating in Kansas. *See Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989) (party moving for transfer is "obligated to clearly specify the key witnesses to be called and make at least a generalized statement of what their testimony would have included").

Second, most of the important events underlying Budicak's claims took place in Kansas. Budicak alleges that Lansing unlawfully and intentionally manipulated wheat futures and options contracts traded on the CBOT. Class Action Compl. ¶ 1. The acts central to these claims occurred in Kansas: (1) the Lansing trader who allegedly purchased the 250 wheat shipping certificates was located in Kansas; (2)

the Lansing trader who cancelled those certificates was also located in Kansas; and (3) the Lansing trader who communicated with third parties to spread information about its plans to the market was likewise located in Kansas. Declaration of Lansing Vice President Mike Lemke ¶ 5. In response, Plaintiff argues that this case is central to Chicago, pointing to the fact that Defendants intended their actions to have an effect in Chicago, Pl.'s Resp. Br. at 3-4, and that the majority of the shipping certificates and the wheat was stored in Chicago, *id.* at 5. But it is unclear, and Budicak does not explain, how these facts bear on any of the *material* issues underlying this lawsuit. Ultimately, the material events underlying Budicak's claims occurred in Kansas, not Chicago.

Moving beyond convenience, Budicak argues that it is nevertheless entitled to deference in its choice of venue. Pl.'s Resp. Br. at 6-7. And at least "when the inconvenience of the alternative venues is comparable," it is true, "the tie is awarded to the plaintiff." *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 665 (7th Cir. 2003). But here there is no tie—the scales of convenience tip in Lansing's favor. What is more, as Lansing points out, Courts in this district have consistently held that a plaintiff's choice of forum is afforded less deference when the plaintiff represents a class. *See Lafleur v. Dollar Tree Stores, Inc.*, 2012 WL 2280090, at *3 (N.D. Ill. June 18, 2012) (citing cases). Budicak seeks to represent "thousands of geographically dispersed Class members." Class Action Compl. ¶ 71-72. So, if the class is certified, chances are Chicago "will not be the home venue for all plaintiffs and any venue selection is bound

7

to be inconvenient to some plaintiffs." *Lafleur*, 2012 WL 2280090, at *3. Under those circumstances, Budicak's choice of venue is discounted.

## B. Interest of Justice

"The interest of justice is a separate element of the transfer analysis that relates to the efficient administration of the court system." *Research Automation*, 626 F.3d at 978 (citing *Van Dusen v. Barrack*, 376 U.S. 612, 626–27 (1964)) (cleaned up). For this element, courts compare the transferor and transferee districts for a variety of factors, including "docket congestion and likely speed to trial," "each court's relative familiarity with the relevant law," "the respective desirability of resolving controversies in each locale," and "the relationship of each community to the controversy." *Id*. (collecting cases). The interest of justice "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Coffey*, 796 F.2d at 220 (citations omitted). All in all, this element too weighs in favor of transfer to Kansas.

First, docket congestion weighs in favor of Kansas here. Defendants argue that the District of Kansas is less congested, pointing out that for the time period of June 30,2017 through June 30, 2018 the median time from filing to trial in civil matters in the Northern District of Illinois was 36.3 months versus 24.5 months in the District of Kansas. Defs.' Mot. Transfer at 12 (citing Federal Court Management Statistics). But Budicak contends that these figures are not a particularly meaningful comparison because only about two percent of all federal civil cases go to trial, and these numbers cover all judges and all types of cases. Pl.'s Resp. at 8. So those numbers, according to Plaintiff, are not necessarily indicative of how long it will take

8

to get to trial in a particular case or in a case of the type at issue here. *Id.* (citing *Summit Container Corp. v. Commc'ns Test Design, Inc.*, 2018 WL 3190822, at *2 (N.D. Ill. May 15, 2018)). But regardless of whether or not the case ultimately goes to trial, there is almost a 12-month difference in the two districts' time-to-trial, and that is at least somewhat indicative of how quickly cases are handled in each district.

Second, aside from timing, each district court's relative familiarity with the relevant law is a neutral consideration. Budicak argues that this Court has more familiarity with Commodities Exchange Act cases, contending that (1) both this district generally and the presiding judge specifically have experience in wheat-contracts manipulation; and (2) the Northern District of Illinois is the "capital of commodity manipulation cases." Pl.'s Resp. Br. at 7 (citing cases). These arguments are not compelling. Expertise with relevant law might be a modestly important factor for cases in which federal courts sit in diversity and are tasked with applying state law; the district court that regularly interprets that particular state law could hold an advantage. But the underlying laws here are federal, and federal courts are "presumed equally capable and experienced with respect to matters of federal law." *Camarena v. Vanderbilt Mortg. & Fin., Inc.*, 2015 WL 4036258, at *4 (N.D. Ill. July 1, 2015) (citing cases).

Lastly, the District of Kansas has a greater interest in resolving this controversy. This case concerns the alleged unlawful behavior of a corporation with its principal place of business in Kansas, and as already discussed, most of the material events underlying this lawsuit occurred there. Although Illinois certainly

9

has some interest in resolving a case in which alleged misconduct injured one of its citizens, Kansas has the stronger interest in addressing misconduct that allegedly occurred, primarily, in Kansas. All in all, the interest-of-justice factors weighs in favor of transferring the case to the District of Kansas.

## IV. Conclusion

For the reasons discussed above, the Court grants Lansing's motion to transfer this case to the District of Kansas. The Clerk shall transfer this case forthwith to the District of Kansas. The Court terminates the two remaining substantive motions, R. 52 and R. 59, without prejudice to allow Lansing to refile them in the District of Kansas after the transfer is effectuated. The status hearing of September 26, 2019 is vacated.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 5, 2019