## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**BUDICAK, INC., BLUE MARLIN ARBITRAGE, LLC, and PRIME TRADING, LLC, individually and on behalf of all others similarly situated,**

      **Plaintiffs,**

      **v.**

**LANSING TRADE GROUP, LLC, et al.,**

      **Defendants.**

**Case No. 2:19-CV-2449-JAR-ADM**

**FILED UNDER SEAL**

## MEMORANDUM AND ORDER

Plaintiffs Budicak, Inc., Blue Marlin Arbitrage, LLC, and Prime Trading, LLC filed this putative class action on behalf of all purchasers, sellers, and holders of wheat futures or options on wheat futures contracts between February 1, 2015 and March 31, 2015 (the proposed "Class Period") against Defendants Lansing Trade Group, LLC ("Lansing"), Cascade Commodity Consulting, LLC ("Cascade"), and certain of their employees and unidentified others (John Does) (all three collectively, "Defendants"). Plaintiffs allege that during the Class Period, Defendants manipulated the prices of Chicago Board of Trade ("CBOT") wheat futures and options contracts in violation of the Commodity Exchange Act and the Sherman Antitrust Act. Lansing filed a Motion to Strike and Motion to Dismiss the Amended Complaint (Doc. 122).[1] The motion is fully briefed, and the Court is prepared to rule. For the reasons provided below, Lansing's motion is **denied**.

---

[1] This case was initially filed in the Northern District of Illinois, during which time Lansing filed a motion to dismiss on the same grounds as the now-pending motion. Plaintiffs and Lansing fully briefed the prior motion. Then, the case was transferred to the District of Kansas and all pending motions were denied without prejudice to refiling. Lansing refiled its motion to dismiss and, with the agreement of Plaintiffs, requested this Court treat it as fully briefed and ripe for adjudication, relying on the parties' prior briefing.

## I.  Background

### A.  Facts

The following facts are alleged in Plaintiffs' Amended Complaint and are assumed to be true for the purposes of deciding Lansing's Motion to Dismiss.

### 1.  Parties Involved

The named plaintiffs in this case are business entities that purchased and/or sold wheat futures and/or options on the CBOT during the Class Period.  Plaintiffs define the class they purport to represent as follows:

> All persons or entities (other than Defendants and any parent, subsidiary, affiliate, or agent of any Defendant) that transacted in CBOT wheat futures or options contracts during the period February 1, 2015 through March 31, 2015 (the "Class Period").[2]

Plaintiffs bring claims against organizational defendants as well as "John Doe" defendants.  Defendant Lansing is a commodities-merchandising firm that buys, handles, stores, and sells wheat.  Certain of the John Doe defendants are suspected subsidiaries of Lansing, traders who discussed the alleged manipulative scheme with Lansing traders, others who acted in concert with Lansing traders, and unidentified market participants that Lansing traders contacted. Defendant Cascade is an entity that publishes a daily cash wheat newsletter (the "Cash Wheat Report"), which is read by a wide audience including hedge traders, private grain analysts, futures brokerage companies, cash brokerage companies, regional grain companies, international grain companies, flour millers, foreign procurement managers, and foreign wheat exporters.

---

[2] Doc. 38 at 31.

## 2.  Commodity Markets Overview

Commodity markets permit traders to invest in physical substances such as metals, oils, livestock, and crops.  The market is comprised of entities that manufacture or produce goods with the commodity and seek to mitigate the risk of price fluctuation in the future; broker-dealers who provide the markets with liquidity; and speculators who seek out opportunities to profit from their investments.  Commodities are traded in two related, although distinct, markets: the cash market and the futures market.  Cash market transactions are priced based on present supply and demand and result in physical exchange of the commodity.   However, most commodity trading involves buying and selling futures and options contracts.

Futures contracts, sometimes simply called "futures," are specialized forward contracts.  Parties agree to the key contract terms—price, quantity, quality, and date of delivery—of a product prior to actual delivery.  To facilitate the purchase and sale of futures, all contract terms other than price are standardized.  The price of a future is determined through a quasi-auction setting, where buyers and sellers negotiate through an organized exchange.  The party selling a future holds a short position; the party purchasing a future holds a long position.  A party who is short is responsible for making delivery of the commodity; a party who is long is responsible for taking delivery of the commodity.  Holders of futures satisfy their contractual obligations in two ways: (1) through an offsetting transaction in the futures market prior to the expiration of trading on that contract; or (2) through either making delivery or taking delivery of the commodity.

A related tool for trading is options contracts, which permit buyers the right to buy or sell a commodity at a specified price and at a specified time.  A party who has the right to buy a commodity has a call option; a party who has the right to sell a commodity has a put option.

Parties to futures and options contracts do not deal directly with one another. Instead, their transactions are facilitated through a third-party clearinghouse known as a commodity exchange. Commodity exchanges perform a variety of functions, including settling accounts, clearing trades, regulating delivery, and ensuring that market participants meet their contact obligations. These exchanges are certified as boards of trade by the Commodity Futures Trading Commission ("CFTC") and subject to its regulation. The Chicago Board of Trade (the "CBOT") is one such exchange. To maintain its status and receive permission to trade certain contacts, the CBOT must establish that the proposed contracts are not prone to price manipulation. Members of the CBOT must follow the CBOT's rules and the rules of the CBOT's parent organization, the Chicago Mercantile Exchange (CME). At each level—the CFTC, the CBOT, and the CME— there are rules and regulations governing the behavior of market participants.

### 3. CBOT Market for Wheat

Wheat futures and options are bought and sold through the CBOT. The CBOT predetermines and standardizes wheat grade differentials, location differentials, and delivery points, among other components of the contracts. Wheat futures and options are traded both on an electronic trading platform and through open outcry on the trading floor of the CBOT, which is a form of public auction. All contracts are priced in "cents per bushel" of wheat. Each CBOT contract, including futures and options, represents 5,000 bushels of wheat or approximately 136 metric tons.

Wheat futures are traded for delivery in March, May, July, September, and December each calendar year. Traders can continue to buy and sell futures until the end of the business day before the 15th calendar day of the contract month. If a trader is settling a contract by physical

delivery, delivery must occur by the second business day after the final trading day of the delivery month.

A party's delivery instrument for futures is called a shipping certificate. Shipping certificates are issued by exchange-approved facilities; unlike a warehouse receipt, the issuing facility is not obligated to store the commodity until the delivery date of the contract. When shipping certificates are registered, it typically indicates excess supply of the commodity and results in a price decline. At 4:00 p.m. on each trading day, the CBOT reports the total number of registered shipping certificates on its website. The owner of a shipping certificate can buy or sell shipping certificates to other market participants; exchange the shipping certificate for futures positions; hold the certificate and pay storage fees starting on the delivery date of the underlying contract; or cancel the shipping certificate. When a shipping certificate is cancelled, the commodity is loaded out for transport. This act is commonly referred to as "cancellation for load-out" or simply "cancellation." Because cancellation is associated with an entity taking possession of a commodity for use, cancellation signals immediate demand for the commodity and typically results in higher prices because of the perceived increase in demand.

### 4.  Alleged Manipulation of the Wheat Markets

Plaintiffs' claims against Defendants involve the relationship between the cash market and futures market, the registration and cancellation of shipping certificates, the purchase and sale of futures contracts, and the publication of Lansing's activities. Together, these actions will be referred to as the "Scheme." The description of the Scheme is based on Plaintiffs' well-pled allegations, which must be taken as true at the motion-to-dismiss stage of litigation.

On February 3, 2015, a trader at Lansing, Adam Flavin, had a phone call with the CEO of Cascade, Al Conway. During that call, the two men discussed the relationship between the cash

wheat market and the futures wheat market. They agreed that the spread—the price differential between the cash and futures market—in the wheat market could be manipulated through use of the cash market because of the high correlation in price movement between the cash and futures markets.

At the start of March 2015, Lansing held 134 registered shipping certificates. On Tuesday, March 3, Lansing received advance information that another market participant was preparing to register a large number of shipping certificates. Once this wave of 250 shipping certificates was registered, prices fell in the futures and cash markets. For instance, the March futures price went from $508.00 on March 2 down to $481.25 on March 5.[3] Between March 3 and March 6, Lansing took long futures positions for May/July 2015, July/September 2015, and September/December 2015; took futures options positions for May and July 2015; and purchased the 250 shipping certificates. By purchasing the 250 newly-registered shipping certificates, Lansing held all 384 registered shipping certificates available to the market.

On March 6, 2015, Flavin referenced a conversation he had with Conway regarding publishing information about Lansing's activity. Flavin indicated that Conway was "gonna give it the gas tonight."[4] Flavin also discussed paying Conway for the wire, presumably because bringing attention to Lansing's actions through the Cash Wheat Report would generate more profit than the market would generate on its own.

Lansing cancelled 316 shipping certificates for load out on Friday, March 6, 2015. A trader of a suspected Lansing subsidiary, Peter Grady, told traders at Lansing that "the important thing is just to get transportation in Chicago and get that shit moving"[5] so that the market would

---

[3] *See* Doc. 38 at 28.

[4] *Id.* at 24.

[5] *Id.* at 25.

believe there was an urgent demand for wheat.  There was no actual need to deliver the wheat to

a manufacturer or processor for use.  Instead, Lansing cancelled the wheat for load-out to send a

signal to the market of immediate demand, thereby driving cash-market prices up and allowing

Lansing to sell their futures and options positions at a profit.  The first trading day after

Lansing's first cancellation was March 9, 2015.  On that day, March futures prices rose from

$485.75 to $494.25.  Lansing cancelled the remaining 68 shipping certificates for load-out on

Tuesday March 10, 2015.  Futures prices continued to rise.  For example, on March 11, the

March futures price rose from $496.50 to $503.00.  March 2015 futures expired on Friday,

March 13, at which time the price was $508.75.  The cash market followed a similar price

pattern, as did the May futures contracts.[6]

## B.  Procedural History

Plaintiffs filed suit on July 20, 2018, in federal district court for the Northern District of

Illinois, Eastern Division.  Shortly after the case was filed, Lansing moved to transfer the case to

the District of Kansas.[7]  While the motion to transfer was pending, Plaintiffs filed an amended

complaint.[8]

The Amended Complaint in this putative class action alleges that Lansing and Cascade

engaged in an unlawful manipulation of wheat prices from February 1, 2015 to March 31, 2015.

In an effort to recover their respective losses resulting from the Scheme, Plaintiffs bring putative

class action claims for: (1) market manipulation in violation of Section 9(a) of the Commodity

Exchange Act ("CEA")[9] and CFTC Rule 180.2; (2) employment of a manipulative or deceptive

---

[6] *See id.* at 29–30.

[7] Doc. 26.

[8] Doc. 38.

[9] 7 U.S.C. § 13(a).

device in violation of Section 6(c)(1) of the CEA[10] and CFTC Rule 180.1; (3) principal-agent liability in violation of the CEA and CFTC Regulation 1.2; (4) aiding and abetting manipulation in violation of the CEA; (5) common law unjust enrichment; and (6) violating Section 1 of the Sherman Antitrust Act[11] ("Sherman Act") and Section 4 of the Clayton Act.[12]

Cascade filed a motion to dismiss for lack of jurisdiction on November 16, 2018.[13] Lansing filed a motion to dismiss on November 16, 2018.[14]  Both of those motions were fully briefed by the parties.  Then, on August 6, 2019, the court in the Northern District of Illinois granted Lansing's motion to transfer.[15]  Prior to transfer, all pending motions were denied without prejudice to refiling.[16]

On September 24, 2019, Lansing filed a Motion to Strike and Motion to Dismiss the Amended Complaint.[17]  In that motion, Lansing indicated that its motion was "merely a refiling of Lansing's previously filed motion to dismiss . . . which ha[d] been fulling briefed and pending in the" Northern District of Illinois.[18]  Accordingly, Lansing requested this Court "consider its re-filed Motion to Dismiss [to be] fully briefed and ripe for ruling," adding that Lansing had "conferred with Plaintiffs' counsel" who agreed that this Court should consider the previously-filed motion, response, and reply.[19]  This Court ordered the parties to file supplemental briefs

---

[10] 7 U.S.C. § 9.

[11] 15 U.S.C. § 1.

[12] 15 U.S.C. § 15(a).

[13] Doc. 52.

[14] Doc. 59.

[15] Doc. 110.

[16] *Id.*

[17] Doc. 122.

[18] *Id.* at 1.

[19] *Id.*

addressing Tenth Circuit authority on the issues presented in Lansing's Motion to Dismiss.[20]
The parties complied, filing their supplemental briefs on February 12, 2020.[21]  The Court
considers all relevant briefing, including the briefs filed while the case was before the Northern
District of Illinois, in its decision.

## II.  Discussion

Lansing moves under Fed. R. Civ. P. 12(b)(1) to dismiss this suit for lack of
constitutional standing, and under Fed. R. Civ. P. 12(b)(6) to dismiss all counts for failure to
state a claim.  First, Lansing asserts that Plaintiffs fail to identify any injury-in-fact and therefore
do not have Article III standing.  Second, Lansing argues that even if they have standing,
Plaintiffs' claims are subject to dismissal because they fail to state any claim upon which relief
may be granted.  Lansing's primary argument for Rule 12(b)(6) dismissal of the CEA claims is
that Plaintiffs fail to allege Lansing sent a false signal to the market.  Relatedly, Lansing argues
that Plaintiffs' unjust enrichment claim must fail since it is predicated on an underlying violation
of the CEA.  Lansing argues that Plaintiffs' antitrust claim is subject to dismissal because: (1)
Plaintiffs fail to allege a per se violation; (2) Plaintiffs fail to allege any agreement between
Lansing and Cascade that would have insulated Cascade from competition; (3) Plaintiffs fail to
allege that Lansing has market power in any antitrust market; and (4) Plaintiffs fail to allege
Defendants' conduct could adversely harm competition.  In the alternative, if the Court finds
Plaintiffs survive the motion to dismiss, Lansing moves to strike the February 1 through March
31 Class Period, limiting it to March 6, 2015 through March 31, 2015.  The Court will address
each of Lansing's arguments in turn.

---

[20] Doc. 156.

[21] Docs. 158, 159.

## A. Constitutional (Article III) Standing

Federal courts are courts of limited jurisdiction and must therefore have a statutory or constitutional basis to exercise jurisdiction.[22]  When it becomes apparent that jurisdiction is lacking, a court must dismiss the case regardless of the stage of the proceeding.[23]  The party who seeks to invoke federal jurisdiction bears the burden of establishing that such jurisdiction is proper.[24]  "Thus, [the] plaintiff bears the burden of showing why [a] case should not be dismissed" when the defendant has brought a jurisdictional challenge.[25]  Mere conclusory allegations of jurisdiction are not enough.[26]

A plaintiff's standing is properly challenged by a Rule 12(b)(1) motion because a party's standing implicates subject-matter jurisdiction.[27]  Generally, a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction takes one of two forms: a facial attack or a factual attack. "[A] facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint.  In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true."[28]  By contrast, if the defendant lodges a factual attack, "a party may go beyond allegations contained in the complaint and challenge the facts

---

[22] *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); *see United States v. Hardage*, 58 F.3d 569, 574 (10th Cir. 1995) ("Federal courts have limited jurisdiction, and they are not omnipotent.  They draw their jurisdiction from the powers specifically granted by Congress, and the Constitution, Article III, Section 2, Clause 1.") (citations omitted).

[23] *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995) (*abrogated on other grounds by Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81 (2014)).

[24] *Montoya*, 296 F.3d at 955.

[25] *Harms v. I.R.S.*, 146 F. Supp. 2d 1128, 1130 (D. Kan. 2001).

[26] *United States ex rel. Hafter, D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999).

[27] *Unicredit Bank AG v. Jue-Thompson*, No. 12-2468-EFM, 2013 WL 6185750, at *3 (D. Kan. Nov. 26, 2013) (citation omitted).

[28] *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

upon which subject matter jurisdiction depends."[29]  A "court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts" under Rule 12(b)(1).[30]

Here, Lansing brings a facial attack, arguing Plaintiffs failed to allege all elements of Article III standing.  Article III requires plaintiffs to demonstrate (1) they have suffered an injury-in-fact that is fairly traceable to the challenged action of defendant and not an independent action of a third party not before the court; and (2) the injury is likely to be redressed by a favorable decision.[31]  Regarding the injury-in-fact element, plaintiffs must have suffered "the invasion of a 'legally protected interest' in a manner that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[32]  Courts evaluating constitutional standing "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."[33]

Lansing does not contest the "fairly traceable" nor the "redressability" components of Plaintiffs' alleged injury; rather, Lansing only argues that Plaintiffs fail to allege an injury-in-fact.  Lansing asserts that Plaintiffs must allege they "suffered a net loss on [their] aggregate positions across all the CBOT wheat futures and options contracts at issue throughout the class period."[34]  Plaintiffs respond that, at this stage in the proceeding, their burden is simply to allege

---

[29] *Id.*; *see also Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1296 (10th Cir. 2003).

[30] *Davis*, 343 F.3d at 1296 (quoting *Holt*, 46 F.3d at 1003).

[31] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

[32] *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015) (quoting *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014)).

[33] *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

[34] Doc. 60-1 at 16.  The Court notes that the authority on which Lansing relies, *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009), involves an appeal from class certification.  The standards articulated in *Kohen* plainly do not apply here, at the motion-to-dismiss stage.  Lansing has not identified any authority, and this Court has discovered none, that applies its asserted standard for pleading injury-in-fact at the motion-to-dismiss phase.

that they lost money as a result of Lansing's alleged manipulation.[35]  Plaintiffs allege they sold wheat futures and options on days when Lansing manipulated the contracts' prices downward, and that they purchased wheat futures and options on days when Lansing manipulated the contracts' prices upward.  While it may be true that some Plaintiffs may have ultimately benefitted from Lansing's alleged price manipulation, that is not an issue ripe for resolution at the pleading stage.[36]  Plaintiffs have alleged a concrete injury—artificial losses or artificially reduced gains on their wheat investments—as a result of Lansing's manipulation sufficient for constitutional standing.[37]  Because Plaintiffs have met their burden to establish standing for jurisdictional purposes, Lansing's Motion to Dismiss on this basis is denied.

## B.  Failure to State a Claim: Rule 12(b)(6) Analysis

In addition to challenging Plaintiffs' Article III standing, Lansing moves for dismissal of all Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level."[38]  The complaint must also include "enough facts to state a claim to relief that is plausible on its face."[39]  Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable

---

[35] *See* Doc. 87 at 13–14.

[36] *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 595 (finding an injury-in-fact where plaintiffs' alleged injuries stemmed from "having to pay supra-competitive prices as a result of [d]efendants' manipulation of" prices, and dismissing defendants' demand for specifics as to the timing of certain transactions as inappropriate at the pleading stage); *see also Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) ("[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.") (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006)).

[37] *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016) (noting that the injury-in-fact prong of constitutional standing is "easily satisfied" by plaintiffs' allegations "that they were harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation").

[38] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004)).

[39] *Twombly*, 550 U.S. at 570.

likelihood of mustering factual support for *these* claims."[40]  The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires "more than a sheer possibility."[41]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[42]  Finally, the court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely that the allegations can be proven.[43]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[44]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[45]  Then the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[46]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[47]

---

[40] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[41] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[42] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[43] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[44] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[45] *Id.* at 678–79.

[46] *Id.* at 679.

[47] *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

### 1.  CEA Claims

Lansing moves to dismiss Counts One through Four of the Amended Complaint for failure to state a claim under Rule 12(b)(6).  Each of these counts are based on violations of the CEA.  Lansing's predominant argument is that Plaintiffs base their causes of action on Lansing sending a "false signal" to the market without actually alleging that the signal Lansing sent was "false."  Lansing also argues that the heightened pleading standard of Fed. R. Civ. P. 9(b) governs these claims because they sound in fraud.  The Court will first address the applicable pleading standard before turning to each claim.

### a.  Pleading Standard

The first four counts of Plaintiffs' Amended Complaint relate to violations of various provisions of the CEA, including manipulation, employing a manipulative or deceptive device or contrivance, principal-agent liability, and aiding and abetting liability.  Because certain market manipulation claims may sound in fraud, Lansing asserts that Plaintiffs' CEA-related claims are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b).  Lansing alleges that Plaintiffs' Amended Complaint does not plead each of these violations with the requisite particularly, entitling Lansing to dismissal.[48]  Plaintiffs respond the allegations relate to market manipulation rather than explicit misrepresentations or omissions, thereby triggering the less-stringent pleading standard articulated in Fed. R. Civ. P. 8(a).  Plaintiffs alternatively argue that, even assuming the Rule 9(b) standard applied, they have met their burden.

The Tenth Circuit has not had occasion to weigh in on the applicable pleading standard for CEA claims.  A survey across other federal circuits reveals reluctance to squarely answer the

---

[48] Lansing also argues, in the alternative, that it would be entitled to dismissal under the Rule 8(a) pleading standard.

question, with many courts assuming without deciding that Rule 9(b) applies, or otherwise avoiding a categorical rule.[49]  For instance, in *U.S. Commodity Futures Trading v. Kraft*, the Northern District of Illinois reasoned that Section 6(c)(1) of the CEA "prohibits only fraudulent manipulations," and accordingly applied Rule 9(b) pleading standards.[50]  The following year, the Northern District of Illinois clarified that "for manipulation based on market activity rather than overt misrepresentations, there is some support for the conclusion that Rule 8(a) could apply, depending on the specific facts."[51]  The Southern District of New York endorses a "case-specific approach" and has declined adoption of a categorical rule for applying either Rule 9(b) or Rule 8(a).[52]

Here, the Court need not determine whether the general Rule 8(a) or heightened Rule 9(b) standard applies because even assuming Lansing is correct that Rule 9(b) governs Plaintiffs' claims, Plaintiffs have met their burden.  The Court will therefore evaluate the sufficiency of Plaintiffs' CEA claims under Rule 9(b).

### b.  Count One: Manipulation

Plaintiffs assert a claim under CEA Section 9(a), which makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce[.]"[53]  To adequately allege fraud or mistake under Rule 9(b), "a party must state with

---

[49] *See U.S. Commodity Futures Trading Comm'n v. Enron Corp.*, No. H-03-909, 2004 WL 594752, at *3 (S.D. Tex. Mar. 10, 2004) (holding that claims under Section 6(c), 6(d), and 9(a)(2) of the CEA "need not be pled with the factual specificity required by Fed. R. Civ. P. 9(b)"); *Premium Plus Partners, L.P. v. Davis*, No. 04 Civ. 1851 (MRF), 2005 WL 711591, at *15 (N.D. Ill. Mar. 28, 2005) (declining to apply Rule 9(b) pleading standards to CEA manipulation claim); *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (applying Rule 9(b) to CEA manipulation claim).

[50] 153 F. Supp. 3d 996, 1010 (N.D. Ill. 2015).

[51] *Ploss v. Kraft Foods Group, Inc.*, 197 F. Supp. 3d 1037, 1057 (N.D. Ill. 2016).

[52] *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 530–31 (S.D.N.Y. 2008).

[53] 7 U.S.C. § 13(a)(2).

particularity the circumstances constituting fraud or mistake."[54]  In manipulation-based CEA

claims, the Rule 9(b) standard is typically relaxed,[55] and simply requires a complaint to describe

"what manipulative acts were performed, which defendants performed them, when the

manipulative acts were performed, and what effect the scheme had on the market for the

securities at issue."[56]  Although Rule 9(b) permits plaintiffs to allege scienter generally, the

complaint must contain facts that "give rise to a strong inference of scienter."[57]

To establish a claim under the CEA for price manipulation, Plaintiffs must allege "(1)

Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3)

Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the

artificial price."[58]  Lansing does not challenge the ability, causation, or intent elements of the

manipulation claim.  Instead, it argues Plaintiffs have not alleged facts showing the "signal" it

sent to the market through its transactions was false, thereby defeating any possibility that

artificial prices existed.  Lansing contends that it is a grain merchandiser with an ongoing

business, and Plaintiffs do not allege Lansing failed to load out its cancelled shipping certificates

for delivery.  Lansing also asserts that the March 2015 futures closing price was $508.75 on both

March 3 and March 13, defeating any argument that the price was artificial.

Viewing the well-pled allegations in the light most favorable to Plaintiffs, as the Court

must do at this stage of the proceedings, the Court finds Plaintiffs have adequately pled the

---

[54] Fed. R. Civ. P. 9(b).

[55] *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).

[56] *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (internal citations omitted);
*see also In re Amaranth Nat. Gas Commodities Litig. (Amaranth I)*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008).

[57] *In re Amaranth Nat. Gas Commodities Litig. (Amaranth II)*, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009)
(quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007)).

[58] *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010).

existence of artificial prices resulting from the Scheme.  "An artificial price is a price that 'does not reflect basic forces of supply and demand.'"[59]  To determine the existence of an artificial price, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and the cash market for the commodity at issue.[60]

Plaintiffs allege that through manipulating the cash market for wheat, Lansing intentionally affected the prices of March 2015, May 2015, July 2015, September 2015, December 2015, and March 2016 futures contracts.  Plaintiffs allege the market signals causing the price fluctuations were false because Lansing planned to "use cash as the tool" to earn a profit.  Lansing would first acquire all existing registered shipping certificates to ensure that its actions had the largest possible impact on futures prices.  Then, Lansing would cancel its shipping certificates for load out, signaling immediate demand for wheat and a lack of supply, thereby driving all wheat market prices—in the cash market and futures market—upward.  Plaintiffs do not argue Lansing lied about canceling the wheat for load-out.  Instead, Plaintiffs allege the load out was not a legitimate transaction, but a predetermined step in Lansing's Scheme to impact wheat market prices.

Although Lansing insists Plaintiffs have not demonstrated that Lansing had "no commercial need" for the wheat it cancelled for load out, that is not Plaintiffs' burden at this stage of the proceeding.  The Court must simply decide whether, when considering Plaintiffs' well-pled allegations as true, they have stated a claim for relief.  The Court finds that Plaintiffs have done so.  Plaintiffs allege price fluctuations in the wheat futures and options contracts were caused by Defendants' Scheme, and Lansing has not identified any market-based explanation for

---

[59] *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012) (quoting *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995)).

[60] *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998).

the shifts in price during the Scheme that would defeat Plaintiffs' well-pled allegations. Plaintiffs have therefore adequately alleged an artificial price existed.

Lansing also contends that Plaintiffs have not sufficiently alleged the requisite state of mind for a manipulation claim. Plaintiffs cite to recorded conversations among Lansing employees and between Lansing officers and Cascade's CEO that demonstrate direct evidence of scienter. Lansing disagrees that these conversations demonstrate scienter, instead interpreting them as support for their claim that all the transactions were legitimate and made good business sense. However, Lansing's arguments simply assert an alternative explanation for the conversations. The Court must construe Plaintiffs' well-pled allegations in the light most favorable to them, which renders Lansing's competing explanation irrelevant. At best, Lansing identifies a competing inference that may be weighed by a fact-finder at later stages of the proceeding.

Even ignoring the direct evidence of conversations provided in the Amended Complaint, Plaintiffs demonstrate scienter. Absent direct evidence, specific intent to manipulate prices can be pled through: (1) allegations that show the defendant had both motive and opportunity to commit the fraud; or (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.[61] Plaintiffs' allegations satisfy either standard. Plaintiffs allege Lansing was motivated to manipulate the price of wheat futures and options because doing so resulted in an arbitrage condition in the futures market on which it was able to profitably trade. Lansing had the opportunity to manipulate the price by virtue of its position in the market as owner of all registered shipping certificates on March 6, 2015. Plaintiffs have more-than satisfied the pleading standard for scienter. Accordingly, Plaintiffs have adequately alleged a

---

[61] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).

price manipulation claim under the CEA.  Lansing's Motion to Dismiss for failure to do so is

therefore denied.

### c.   Count Two: Employing a Manipulative/Deceptive Device

Plaintiffs bring a claim under CEA Section 6(c)(1)[62] and CFTC Regulation 180.1.[63]

Those provisions make it unlawful for any person to "use or employ . . . in connection with any

swap, or a contract of sale of any commodity . . . any manipulative or deceptive device or

contrivance, in contravention of [CFTC rules and regulations],"[64] or to:

> (2) [m]ake, or attempt to make, any untrue or misleading statement
> of a material fact or to omit to state a material fact necessary in order
> to make the statements made not untrue or misleading;
>
> (3) [e]ngage, or attempt to engage, in any act, practice, or course of
> business, which operates or would operate as a fraud or deceit upon
> any person; or,
>
> (4) [d]eliver or cause to be delivered . . . a false or misleading or
> inaccurate report concerning . . . market information or conditions
> that affect or tend to affect the price of any commodity in interstate
> commerce[.][65]

Although the phrase "manipulative or deceptive device or contrivance" is not defined by

the statute or regulation, the CFTC has noted that "the operative phrase 'manipulative or

deceptive device or contrivance' is virtually identical to the terms used in section 10(b) of the

Securities Exchange Act of 1934."[66]  The CFTC is therefore "guided, but not controlled, by the

---

[62] 7 U.S.C. § 9.

[63] 17 C.F.R. § 180.1.

[64] 7 U.S.C. § 9(1).

[65] 17 C.F.R. § 180.1(a).

[66] *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41398-01 at 41,399 (July 14, 2011).

substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5" due to "the differences between the securities markets and the derivatives markets."[67]

Lansing contends Plaintiffs have failed to state a Section 6(c)(1) CEA claim because Plaintiffs have not demonstrated the signal Lansing sent to the market when it cancelled the wheat shipping certificates for load-out was false. Lansing reiterates that it actually cancelled the certificates and prepared to make delivery on the contracts. Plaintiffs respond that the relevant inquiry is not whether something actually took place, but whether Lansing's actions were motivated by a desire to artificially move prices.

CFTC Regulation 180.1 provides that the requisite state of mind for a Section 6(c)(1) violation is taking an action "intentionally or recklessly."[68] The CFTC clarifies that, "[c]onsistent with long-standing precedent under the commodities and securities laws, the [CFTC] defines recklessness as an act or omission that 'departs so far from the standards of ordinary care that it is very difficult to believe the actor was not aware of what he or she was doing.'"[69]

The Amended Complaint provides factual allegations showing Lansing intended to "deceive or defraud" other wheat market "investors by controlling or artificially affecting the price of" commodities instruments, including futures.[70] Plaintiffs specify that Lansing created and adopted its course of action "to manipulate CBOT wheat futures and options to benefit

---

[67] *Id.*

[68] 17 C.F.R. § 180.1(a).

[69] *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41398-01 at 41,404 (July 14, 2011) (internal citation omitted).

[70] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976).

[Lansing's] positions at the expense of Plaintiffs and the Class."[71]  Plaintiffs support their conclusion by pleading facts that show intent, in the form of conversations between Lansing traders that constitute direct evidence of intent; Plaintiffs' factual allegations also provide circumstantial evidence giving rise to a strong inference of intent.

The direct communications support a finding of intentional conduct, particularly when the Court draws all reasonable inferences in Plaintiffs' favor.  For instance, during a phone call on March 6, 2015, Grady remarked, "I think the important thing is just to get transportation in Chicago and get that shit moving."[72]  This suggests to the Court that there was no buyer actually demanding the wheat, but instead that cancelling the wheat certificates for load out was done purely to move the price of wheat futures and options.  Additionally, Lansing traders discussed how the market would react to the Scheme.  During a March 5, 2015 phone call between Flavin and John Pearson, a Chicago-based market participant, the following exchange occurred:

> AF: What do you think it does if someone can use [the 3-vomitoxin wheat]?
> JP: Say that again?
> AF: What do you think it does to the curve if it gets cancelled?
> JP: If somebody takes them?
> AF: Yeah.
> JP: Yeah, uh boy, I think it has big ramifications.  You've just traded everybody out of their position, and you've done it on the premise that you have a poisoned well.[73]

The Amended Complaint contains examples of similar conversations between Lansing-affiliated traders and other market participants.  The allegations demonstrate Lansing expected its actions to impact the price of cash markets, which would result in corresponding changes in the futures market, allowing Lansing to profit on their market positions.

---

[71] Doc. 38 at 2, 22 (alleging that Lansing's goal was to "make the signal [of artificial demand for delivery of wheat] have has broad a reach and be as 'potent' as possible").

[72] *Id.* at 25.

[73] *Id.* at 20.

The circumstantial allegations surrounding Lansing's actions in February and March of 2015 establish Lansing's intent to improperly manipulate the market for financial gain.  Lansing purchased all 250 certificates that were tendered on March 3, resulting in Lansing holding all CBOT-registered wheat shipping certificates.  This totaled 384 shipping certificates—the equivalent of about 115.2 million pounds of wheat.  Plaintiffs allege Lansing had no commercial need for this amount of wheat, nor any economic reason to purchase it.  Plaintiffs add that the cancellation for load-out of these shipping certificates was done for purely manipulative reasons and did not have any legitimate business purpose.

In sum, Plaintiffs sufficiently allege Lansing intended to manipulate the wheat markets.  At the very least, Plaintiffs have met their burden of demonstrating Lansing engaged in reckless conduct—a state of mind which suffices to plead scienter under Section 6(c)(1).  Lansing's Motion to Dismiss Count II is denied.

### d.  Count Three: Principal-Agent Liability

Section 2(a)(1)(B) of the CEA provides that a principal shall be liable for the acts of its agents in certain circumstances.[74]  Under that section, a claim for principal-agent liability requires the agent acted in the capacity of an agent when he or she committed the alleged unlawful acts, and the agent's actions were within the scope of his or her employment.  This section is "a variant of the common law principle of *respondeat superior*," which holds employers "strictly liable—that is to say, regardless of the presence or absence of fault on the employer's part—for torts committed by [their] employees in the furtherance of [their] business."[75]  Lansing may be held vicariously liable under Section 2(a)(1)(B) if: (1) its

---

[74] 7 U.S.C. § 2(a)(1)(B).

[75] *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 515 (S.D.N.Y. 2004) (quoting *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986)).

employees were acting as Lansing's agents when they took the alleged manipulative actions; and (2) the employees' actions were within the scope of their employment at Lansing.[76]

In its Motion to Dismiss, Lansing does not address either element of Plaintiffs' principal-agent claim.  Instead, Lansing asserts that because Plaintiffs failed to allege a Section 9(a) or Section 6(c)(1) claim, they cannot bring a principal-agent liability claim.  As previously discussed, Plaintiffs' Section 9(a) and 6(c)(1) claims both survive Lansing's Motion to Dismiss.  Accordingly, Plaintiffs' principal-agent liability claim also survives, and Lansing's Motion to Dismiss this claim is denied.

### e.  Count Four: Aiding and Abetting Liability

Section 22 of the CEA establishes liability for any person "who willfully aids, abets, counsels, induces, or procures the commission of a violation" of the CEA.[77]  As with its challenge to Plaintiffs' principal-agent liability claim, Lansing's only argument for dismissal of this count is that there is no underlying Section 9(a) or Section 6(c)(1) claim.  Because the Court finds Plaintiffs have sufficiently alleged violations of Section 9(a) and 6(c)(1), Plaintiffs' aiding and abetting claim also survives.  Lansing's Motion to Dismiss this claim is thereby denied.

### 2.  Unjust Enrichment Claim

Plaintiffs bring a common law unjust enrichment claim based on the same underlying facts as their CEA claims, seeking restitution and disgorgement of Lansing's ill-gotten gains.  Lansing argues this claim should be dismissed for two reasons: (1) Plaintiffs fail to allege an underlying CEA violation; and (2) the CEA prohibits common-law remedies.  Because the Court finds Plaintiffs have stated their claims for CEA violations, Lansing's first argument fails.

---

[76] *Guttman v. Commodity Futures Trading Comm'n*, 197 F.3d 33, 39 (2d Cir. 1999).

[77] 7 U.S.C. § 25(a)(1).

Lansing's argument that the CEA preempts common law unjust enrichment claims is similarly unavailing. Lansing provides virtually no argument regarding preemption, notwithstanding the oversized brief in support of its Motion to Dismiss. Though Plaintiffs responded to this argument, Lansing did not address Plaintiffs' arguments in its reply. Even if Lansing had articulated a well-supported argument for preemption, the unjust enrichment claim would not be subject to dismissal. The Tenth Circuit has not yet addressed whether the CEA precludes common law unjust enrichment claims, but the prevailing view in other federal circuits is that unjust enrichment claims may be brought alongside CEA claims.[78]

Moreover, Lansing's position is inconsistent with the plain text of the CEA. The CEA authorizes private rights of action where the plaintiff has suffered actual damages.[79] The CEA also provides that "[t]he rights of action authorized by this subsection . . . shall be the exclusive remedies under this chapter . . . ."[80] The inclusion of the phrase "under this chapter" indicates that the CEA's exclusivity provision applies only to private actions based on CEA violations; it says nothing about limiting or preventing remedies based on other federal or state law actions. Accordingly, Lansing's Motion to Dismiss Plaintiffs' unjust enrichment claim is denied.

### 3. Antitrust Claim

Plaintiffs' final claim is for "price-fixing" in violation of Section 1 of the Sherman Act. Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or

---

[78] *Compare Mobarak v. Mowad*, 986 N.Y.S. 2d 539 (2d Dep't 2014), *with In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013). For example, Plaintiffs' CEA claim requires a showing that it was Lansing's intent to create artificial market prices, *see In re Amaranth*, 730 F.3d at 173, an element Plaintiffs need not establish for their unjust enrichment claim, *see Mobarak*, 986 N.Y.S.2d 539. *See also Ploss v. Kraft Foods Group, Inc.*, 197 F. Supp. 3d 1037, 1075 (N.D. Ill. 2016).

[79] 7 U.S.C. § 25(a).

[80] *Id.*

24

conspiracy, in restraint of trade or commerce among the several States[.]"[81]  Additionally,

"[b]ecause § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only

restraints effected by a contract, combination, or conspiracy, the crucial question is whether the

challenged anticompetitive conduct stems from independent decision or from an agreement, tacit

or express."[82]  Though this is a criminal statute, private parties can enforce Section 1 claims

through Section 4 of the Clayton Act, which permits any person injured in his or her business or

property to sue for treble damages.[83]

A plaintiff bringing a Section 1 claim must plead the following three elements in order to

state a claim: (1) a contract, combination, or conspiracy among two or more independent actors;

(2) that unreasonably restrains trade; and (3) is in, or substantially affects, interstate commerce.[84]

Here, Lansing does not contest the third element; instead, its arguments focus on whether

Plaintiffs have alleged an agreement and, if so, whether that agreement is one that unreasonably

restrains trade.

### a.  Existence of an Antitrust Agreement or Conspiracy

Lansing argues Plaintiffs do not allege Cascade joined in a conspiracy with Lansing,

thereby defeating any possibility of a Sherman Act violation.  "An agreement or conspiracy

under federal antitrust laws is said to exist when 'there is a unity of purpose, a common design

and understanding, a meeting of the minds, or a conscious commitment to a common scheme.'"[85]

Plaintiffs are permitted to "'plead an agreement by alleging direct or circumstantial evidence, or

---

[81] 15 U.S.C. § 1.

[82] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal quotations omitted).

[83] *See* 15 U.S.C. § 15.

[84] *TV Commc'ns Network, Inc. v. Turner Network Television*, 964 F.2d 1022, 1027 (10th Cir. 1992).

[85] *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1223 (D. Kan. 2013) (quoting *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010)).

a combination of the two,' but allegations of direct evidence, that are adequately detailed, are sufficient alone."[86]  However, "[b]are bones accusations of a conspiracy without any supporting facts are insufficient to state an antitrust claim."[87]

Lansing asserts Plaintiffs fail to allege any agreement existed between Cascade and Lansing.  It argues Plaintiffs have failed to demonstrate Cascade consciously agreed to some unlawful scheme, and that Plaintiffs fail to provide any motive as to why Cascade would conspire with Lansing.

Notwithstanding Lansing's assertions, the Court finds Plaintiffs sufficiently allege an agreement existed between Cascade and Lansing.  The Complaint references multiple conversations which, viewed in the light most favorable to Plaintiffs, imply the existence of an agreement between Cascade and Lansing.  For instance, Plaintiffs allege Flavin spoke with Conway about the timing of Lansing's cancellation for load out.  Flavin remarked that he was waiting for the market to get lopsided before cancelling for load out, to which Conway replied it was "all part of the plan."  Plaintiffs also cite to instances of traders at Lansing remarking that Cascade would "give [the Scheme] the gas" to increase Lansing's profits.   Plaintiffs further allege two Lansing traders discussed paying Conway for publishing information about Lansing's market positions in the Cash Wheat Report.  These allegations, "taken together . . . provide a sufficient basis to plausibly contextualize the agreement necessary for pleading a § 1 [Sherman Act] claim."[88]

---

[86] *Id.*

[87] *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (citation omitted).

[88] *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 47 (1st Cir. 2013).

### b. Unreasonable Restraint of Trade

The parties primarily disagree about whether Plaintiffs have alleged the agreement constitutes an unreasonable restraint of trade.  At the pleading stage, stating a Section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made . . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."[89]  Once a court has determined the plaintiff plausibly alleged an agreement, the question becomes whether the agreement itself was illegal.  Under Section 1, an agreement is considered illegal if: (1) it "constitute[s] a per se violation of the [Sherman Act]," or (2) its "purpose or effect is to create an unreasonable restraint of trade."[90]  Claims of the first type—those where the underlying agreement is per se illegal—are evaluated with less scrutiny than the latter type.

Per se treatment is appropriate where the illegal conduct at issue appears on its face to be the sort of conduct that would nearly always have anticompetitive effects.[91]  The purpose of the per se rule is to avoid burdensome inquiry and analysis in situations where it is not required.[92]  By contrast, when the challenged conduct is alleged to have the purpose or effect of creating an unreasonable restraint of trade, courts apply "rule-of-reason" analysis, under which the fact-finder weighs a "variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and

---

[89] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

[90] *Cayman Exploration Corp. v. United Gas Pipe Line*, 873 F.2d 1357, 1359–60 (10th Cir. 1989).

[91] *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc*, 441 U.S. 1, 19–20 (1979).

[92] *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 433 (1990).

effect."[93]  In rule-of-reason cases, plaintiffs ultimately bear the burden of showing that the conduct at issue adversely affected competition.[94]

Plaintiffs characterize their Sherman Act claim as one for price-fixing, a type of claim typically considered a per se violation.  They explain that price-fixing is a broad term, encompassing "[a]ny 'combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity[.]'"[95]  Plaintiffs rely on the conversations between traders at Lansing and the CEO of Cascade to demonstrate that the agreement was, at its core, about impacting the price of the wheat futures market.  In particular, Plaintiffs cite to Flavin's comment that he was waiting for the market to get even more lopsided before cancelling Lansing's shipping certificates for load out as evidence that the Scheme was one to fix prices.  Lansing responds that Plaintiffs' characterization of the Scheme as "price fixing" is a legal conclusion that the Court should disregard because Plaintiffs "allege no facts in support of it."[96]  Thus, Lansing suggests Plaintiffs' Section 1 claim should be analyzed under the rule-of-reason framework.

As a general rule, alleged violations of the Sherman Act are evaluated under the rule-of-reason framework rather than the per se rule.  "It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act."[97]  The Sherman Act per se rule was created to promote litigation efficiency and certainty by categorically prohibiting conduct that has a "pernicious effect on competition" and has no

---

[93] *State Oil Co. v. Khan*, 522 U.S. 3, 10 (citing *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 343 (1982)).

[94] *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992).

[95] Doc. 104 at 26 (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).

[96] Doc. 60-1 at 27.

[97] *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607–08 (1973).

"redeeming virtue."[98]  Examples of per se violations include horizontal price-fixing between competitors, bid rigging, division of markets, and limitation of production.[99]

Here, Plaintiffs' Sherman Act claim does not fall within the standard scope of "price-fixing" claims such that Plaintiffs are entitled to per se analysis of their Section 1 claim.  The crux of Plaintiffs' claim is that Cascade and Lansing agreed that Lansing would purchase registered shipping certificates, and once the wheat markets got lopsided enough, Lansing would cancel those shipping certificates for load out, and Cascade would report that information in its highly-regarded Cash Wheat Report.  Cascade's role in the Scheme was to "give it the gas" in order to maximize Lansing's profit.  Lansing would pay Cascade for its role in the Scheme.  By contrast, a typical price-fixing claim involves collusion between competitors in the same market (horizontal price-fixing), or between two levels in the same supply chain for a particular product (vertical price-fixing).[100]

"Unless the restraint falls squarely into a per se category, the rule of reason should be used."[101]  Plaintiffs provide no cases, and the Court has uncovered none, where a court afforded per se analysis to a price-fixing conspiracy between non-competitors.  Thus, the Court evaluates Plaintiffs' allegations using the rule of reason.

The rule of reason requires the Court to determine whether the challenged practice restrains trade unreasonably and is therefore prohibited under Section 1.[102]  "Courts have

---

[98] *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).

[99] 10A Fletcher Cyclopedia of Private Corp. § 4982.05 (Nov. 2004).

[100] *See, e.g.*, *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006); *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 436 n.19 (1990).

[101] *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 271 (6th Cir. 2014).

[102] *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).

imposed a consistent structure on rule of reason analysis by casting it in terms of shifting burdens of proof."[103]  The burden-shifting framework has been described as follows:

> The plaintiff bears the initial burden of showing that an agreement had a substantially adverse effect on competition.  If the plaintiff meets this burden, the burden shifts to the defendant to come forward with evidence of the procompetitive virtues of the alleged wrongful conduct. If the defendant is able to demonstrate procompetitive effects, the plaintiff then must prove that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner.  Ultimately, if these steps are met, the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable.[104]

To carry its initial burden, the plaintiff "cannot simply show that the challenged action adversely affected their business."[105]  This is because the antitrust laws are concerned with impacts on competition, not competitors.  The plaintiff must therefore show "an adverse effect on competition in general."[106]  At the motion-to-dismiss stage, the plaintiff is only required to show that it is plausible discovery will reveal the defendants' agreement to be illegal.

Courts provide multiple ways to establish an alleged restraint either has or is likely to have a significant anticompetitive effect: (1) a "quick look" rule-of-reason analysis, (2) directly establishing anticompetitive effects, or (3) indirectly establishing anticompetitive effects.[107]  In "quick look" cases, courts assume the existence of anticompetitive effects where the challenged conduct is a "naked" and effective restraint on price or output that carries "obvious"

---

[103] *Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998).

[104] *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 (10th Cir. 2006) (quoting *Law*, 134 F.3d at 1019).

[105] *Id.*

[106] *Id.*; *see also SCFC ILC v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994) (explaining that "a practice ultimately judged anticompetitive is one which harms *competition*, not a particular *competitor*") (emphasis added).

[107] *See, e.g.*, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999).

anticompetitive consequences.[108]  Quick-look cases immediately shift the burden to the

defendant to provide countervailing procompetitive effects.[109]  To directly establish

anticompetitive effects, a plaintiff provides direct evidence of how the defendant's conduct has

impacted the market, such as a reduction in output or raised prices.[110]  To indirectly establish

anticompetitive effects, the plaintiff "defin[es] a relevant product and geographic market" and

shows the defendant possessed market power in that market.[111]

 Here, the parties dedicate a significant portion of their briefs to arguing which framework

applies to Plaintiffs' Section 1 claim.  Plaintiffs assert that if the Court does not find their Section

1 claim is a per se violation of the Sherman Act, the Court should apply a "quick look" rule-of-

reason analysis.  Lansing, however, argues Plaintiffs are required to plead the existence of a

relevant market, Lansing's market power therein, and anticompetitive effects of Lansing's

actions in order for their claim to survive dismissal.

 At the motion-to-dismiss stage, the Court finds it unnecessary to determine which

framework Plaintiffs must or should use in order to establish the Scheme constituted an

unreasonable restraint of trade.  It is sufficient at this stage for Plaintiffs to have plausibly alleged

that discovery will reveal the illegality of Defendants' agreement.  Plaintiffs have plainly done

so.  They note the existence of a parallel lawsuit by the CFTC in which multiple Lansing traders

were fined and/or suspended from trading based on their conduct.  Plaintiffs also rely on direct

---

[108] *Id.* at 769–70 (1999); *see also Law*, 134 F.3d at 1019–20.

[109] *See, e.g.*, *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 362 (5th Cir. 2008) (citing *Cal. Dental*, 526 U.S. at 775 n.12).

[110] *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986); *Law*, 134 F.3d at 1019.

[111] *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013) (applying indirect effects to a Sherman Act Section 2 claim); *but see SCFC ILC*, 36 F.3d at 965–66 (treating market power as indirect proof of anticompetitive effects under a Section 1 rule-of-reason inquiry).

evidence of conversations between Lansing traders and the CEO of Cascade to illustrate the Scheme was designed to artificially move prices notwithstanding standard market forces.

Even assuming Plaintiffs were required to satisfy one of the three evidentiary methods for demonstrating the unreasonable nature of the alleged restraint on trade, Plaintiffs have done so. At this early stage of the proceeding, Plaintiffs have alleged sufficient, well-pled facts to indirectly establish anticompetitive effects resulting from the Scheme because they have defined a relevant market and alleged Lansing had market power therein.

For the purpose of an antitrust claim, the relevant market "'is composed of products that have reasonable interchangeability for the purposes for which they are produced.'"[112] "'[T]he geographic market is the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market.'"[113] "Failure to allege a legally sufficient market is cause for dismissal of the [antitrust] claim."[114]

Lansing asserts Plaintiffs fail to sufficiently allege a relevant market for their antitrust claim. Although Lansing concedes "[t]he Complaint appears to define the market as the 'CBOT wheat futures and options contract market,'" it argues that "[t]he Complaint contains no allegations justifying that as a proper antitrust market."[115] Plaintiffs argue they have sufficiently alleged the relevant market.[116]

---

[112] *Auraria Student Hous. at the Regency, LLC v. Campus Vills. Apartments, LLC*, 843 F.3d 1225, 1244–45 (10th Cir. 2016) (quoting *SCFC ILC*, 36 F.3d at 966).

[113] *Auraria Student Hous.*, 843 F.3d at 1245 (quoting *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986)).

[114] *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").

[115] Doc. 60-1 at 30.

[116] *See, e.g.*, Doc. 87 at 29 ("Plaintiffs allege a manipulation of a commodities futures market."); Doc. 104 at 29.

The Court agrees that Plaintiffs have alleged a relevant market sufficient to withstand Lansing's Motion to Dismiss. Lansing provides no reason why Plaintiffs' Amended Complaint is deficient. Lansing asserts the Amended Complaint *does* define the market as the CBOT wheat futures and options contract market, but concludes the Amended Complaint does not justify this "market" as a proper antitrust market. Lansing does not cite any authority requiring Plaintiffs to provide additional detail at the motion-to-dismiss stage. The Court also agrees with the view of the Second Circuit, adopted by many courts and echoed by the Tenth Circuit, that "market definition is a deeply fact-intensive inquiry," and that courts should therefore "hesitate to grant motions to dismiss for failure to plead a relevant product market."[117]

The parties also dispute whether Plaintiffs have sufficiently alleged market power. Lansing argues Plaintiffs fail to make any allegations that Lansing had power in the CBOT wheat futures and options contract market. Lansing reasons that the market encompasses at least six distinct CBOT wheat futures contracts and associated options that are traded constantly, and Lansing could not have possibly had enough power to impact that market.

Plaintiffs allege Lansing's actions caused them to lose money—either directly or by overpaying to offset their positions—and deprived them of trading in a market whose prices were reflective of true supply and demand during the Scheme. Plaintiffs also demonstrate the direct relationship between the cash market and the futures and options market. Lansing does not contest that it held all the available, registered wheat shipping certificates in March 2015. Plaintiffs also allege the Cash Wheat Report is widely circulated and read by many market

---

[117] *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001); *see also Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992); *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220 (10th Cir. 1986); *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1066 (D. Colo. 2012); *Allen v. Dairy Farmers of America, Inc.,* 748 F. Supp. 2d 323, 336–37 (D. Vt. 2010); *Lockheed Martin Corp. v. Boeing Co.*, 314 F. Supp. 2d 1198, 1225 (M.D. Fla. 2004).

participants.  Because Lansing had full control over the registered shipping certificates, and because Plaintiffs have alleged this market was significantly tied to the futures and options markets, it is plausible that Lansing, in combination with Cascade, had sufficient market power to shift the price of wheat futures and options.

Lansing's argument that Plaintiffs have not alleged any anticompetitive effects is similarly unavailing.  Lansing asserts that its actions were actually procompetitive and did not exclude competitors from entering into or participating in the market.  Plaintiffs respond that manipulation of a commodities market has no procompetitive justification because market participation depends on the notion that the given market reflects true supply and demand.  Because Plaintiffs have alleged the existence of indirect evidence that the Scheme had anticompetitive effects, they need not also allege direct anticompetitive effects.  This is particularly true at the motion-to-dismiss stage, where the burden on Plaintiffs is only to plausibly allege they are entitled to relief.  Because Plaintiffs' well-pled allegations state a claim for violation of Section 1 of the Sherman Act, Lansing's Motion to Dismiss this claim is denied.

### C.  Strike the Class Period

Finally, Lansing argues that, to the extent any of Plaintiffs' claims survive its Motion to Dismiss, the Court should strike the allegation that the Class Period began on February 1, 2015 and confine the beginning of the proposed Class Period to March 6, 2015.  Lansing argues the Amended Complaint alleges Lansing's conduct did not result in artificial prices until March 6, when Lansing first cancelled certificates for load out.  Plaintiffs respond that Lansing's motion is premature because there are significant, unresolved factual issues; because the case has not yet proceeded to class certification; and because discovery has not yet started.

The Court agrees with Plaintiffs that Lansing's motion is premature and cannot be decided based on the existing record.  As such, the Court denies Lansing's motion to strike the class period without prejudice.

**III. Conclusion**

For the reasons set out above, Lansing's Motion to Dismiss is denied.  The Court finds Plaintiffs have alleged standing sufficient to confer jurisdiction on this Court, and that Plaintiffs have successfully stated a claim for each cause of action in their Complaint.  The Court also finds Lansing's motion to strike the class period to be premature and denies the motion without prejudice.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Lansing's Motion to Dismiss (Doc. 122) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Lansing's Motion to Strike is **DENIED without prejudice**.

**IT IS SO ORDERED.**

Dated: March 25, 2020

       s/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE